IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | | |
|---|---|---|
| DENZEL NELSON, | ) | |
| | ) | 08 C 4754 |
| Plaintiff, | ) | |
| | ) | Judge St. Eve |
| v. | ) | |
| | ) | Magistrate Judge Cox |
| CITY OF Chicago, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**STATEMENT OF ADDITIONAL FACTS**

Defendants, Chicago Police Officers Thomas McKenna, Jason Van Dyke, Joseph Merkel, George Spacek, Michael Bubacz, and Jason Cartwright, by and through one of their attorneys, Gail L. Reich, Assistant Corporation Counsel, submit the following Response to Plaintiffs' Local Rule 56.1(b)(3) Statement of Additional Facts:

1. On August 21, 2007, Denzel Nelson, then seventeen years old and about to begin his senior year in high school, was at a friend's house playing video games and watching television. *Ex. M (Denzel Dep.) at p. 18: 12-16; at p. 22: 11-14; at p. 54: 10-23; at p. 61: 8-15; Ex. Q (Crim. Trial Transc.) at p. 73: 1-18; at p. 89: 14-21; at p. 90: 4-18; at p. 91: 10-13*.

**RESPONSE:** Defendants admit that Denzel Nelson was 17 years old on August 21, 2007 and that he was in high school and that he testified that he had been at a friend's house playing video games. Defendants deny that the remaining exhibits support these and the remaining facts and therefore those facts should be disregarded or stricken. *Ex. Q (Crim. Trial Transc.) at p. 73: 1-18; at p. 90: 4-18*. Defendants further deny that these facts, as stated, raise any issue of material fact warranting denial of Defendants' Motion for Summary Judgment.

2. Denzel's friend's house, the Barnes' residence, was located on the 7900 block of South Carpenter street, four houses down from the corner of Carpenter and 80th Streets, on the opposite side of the street and at the other end of the block (the south end) from where McKenna

and Van Dyke stopped the suspect's vehicle. The 7900 block of South Carpenter is a one-way street that dead-ends at the north end of the block at 79th Street. *Ex. M (Denzel Dep.) at p. 60: 12-19; Ex. O (Van Dyke Dep.) at pp. 37-38: 21-24, 1-5; Ex. N (McKenna Dep.) at p. 95:4-14*.

**RESPONSE:** Defendants admit that the Barnes' house was located at 7951 S. Carpenter, and that the suspect's vehicle was stopped at 7926 S. Carpenter, which was north of the Barnes' house. Defendants further admit that at the north end of Carpenter street there is a cul-de-sac. Defendants deny that the following exhibits support these and the remaining facts and therefore those facts should be disregarded or stricken (*Ex. M (Denzel Dep.) at p. 60: 14-19; Ex. N (McKenna Dep.) at p. 95:11-14*. Defendants further deny that these facts raise any issue of material fact warranting denial of Defendants' Motion for Summary Judgment.

3. Around 7:00 p.m. that night, Denzel and his friend's younger brother, then eleven-year old Ryan Barnes, walked out of the Barnes' home. Ryan sat down on the front steps. *Ex. M (Denzel Dep.) at p. 61: 17-20; Ex. Q (Crim. Trial Transc.) at p. 90: 10-13; Ex. U (Ryan Barnes' Affidavit)*.

**RESPONSE:** Defendants admit that Denzel testified he left 7951 S. Carpenter that evening to look for his girlfriend. Defendants deny that *Plaintiff's Exhibit U* establishes that Ryan Barnes and Denzel Nelson exited the home simultaneously. The affidavit states that Ryan Barnes "was with Denzel Nelson at 7951 S. Carpenter Street just before he was arrested. *Pltf's Ex U*. Defendants further deny that the remaining exhibits and affidavit support these and the remaining facts. *Ex. Q (Crim. Trial Transc.) at p. 90: 10-13; Ex. U (Ryan Barnes' Affidavit)*. Denzel left the house alone and no one walked out with him. *Def's 56.1 Stmt ¶ 20*. Defendants further deny that these facts raise any issue of material fact warranting denial of Defendants' Motion for Summary Judgment.

4. Denzel turned left, and walked towards the corner of Carpenter and 80th Street to look for his girlfriend whom he expected to meet on her way walking home. *Ex. M (Denzel*

*Dep.) at p. 61: 17-20; Ex. Q (Crim. Trial Transc.) at p. 90: 4-18*.

**RESPONSE:** Defendants admit that Denzel left the house to see if his girlfriend was coming walking down the street. Defendants deny that the following exhibit supports the remaining facts and those facts should be disregarded or stricken. *Ex. Q (Crim. Trial Transc.) at p. 90: 4-18*. Defendants further deny that these facts raise any material issue sufficient to support denial of Defendants' motion for summary judgment.

5. Van Dyke and McKenna were still 30 - 40 feet away from the suspect and inside their police car, when the suspect jumped out and ran. *Ex. Q (Crim. Trial Transc.) at p. 9:9-16; p. 114: 18-22; p. 115:9-12*.

**RESPONSE:** Defendants admit that the suspect was, at a maximum, 30-40 feet away. Defendants further deny that these facts raise any material issue sufficient to support denial of Defendants' motion for summary judgment.

6. When the suspect ran, McKenna exited the front passenger seat of the squad car to chase the suspect. Van Dyke, who was in the driver's seat, stayed behind to secure the subject's vehicle and its remaining occupants. Van Dyke did not know what the suspect did after he went northbound because he started to pay attention to the vehicle and what was going on with the three other people in the car. *Ex. Q (Crim. Trial Transc.) at p. 9: 4-13; at p. 107: 1-11; at p. 117: 3-7*.

**RESPONSE:** Defendants admit that McKenna exited the front passenger seat of the squad car to chase the suspect. Defendants further admit that Van Dyke, the driver, went to secure the vehicle and its remaining occupants. Defendants admit that Van Dyke did not know what the suspect did immediately after he initially fled Northbound on the west side of Carpenter. Defendants deny that Van Dyke did not know what the suspect did after he ran northbound because Van Dyke testified that he observed the suspect run through a gangway, and around a building. *Def's 56.1 Stmt ¶14*. Therefore, those facts should be disregarded or stricken.

Defendants further deny that these facts raise any material issue of fact sufficient to support denial of Defendants' motion for summary judgment.

7. At the time of the foot chase, McKenna was thirty-seven-years-old, weighed two-hundred-and-fifty-pounds, wore over twenty-five pounds worth of cumbersome equipment (a Kevlar vest weighing as much as 10 lbs., a duty belt filled with his 9 millimeter pistol, weighing as much as 10 lbs., three magazines/clips, one or two pairs of handcuffs, and a radio) and army-type boots. *Ex. N (McKenna Dep.) at pp. 45, and 57-60.*

**RESPONSE:** Defendants admit that McKenna was wearing a Kevlar bullet-proof vest, weighing as much as 10 lbs. and carrying a duty belt with a gun, and three magazines, a radio and handcuffs, weighing as much as 10 lbs., and that he was wearing light work books. Defendants deny that the *Ex. N (McKenna Dep.) at pp. 45.* supports the facts in ¶ 7, as the testimony cited establishes that McKenna observed the suspect exit the car and gave a description of the suspect, therefore those facts should be disregarded or stricken. Defendants further deny that these facts raise any material issue of fact sufficient to support denial of Defendants' motion for summary judgment.

8. During the foot chase, McKenna related the only information he had of the suspect over his police radio, describing him only as: "male, black, 6'2" - 6'3", white t-shirt, blue jeans, white gym shoes." McKenna did not provide any information as to whether the suspect had facial hair or glasses, or even whether the suspect was in his forties or his teens. During the chase, McKenna did not mention anything over the radio about the suspect having or possibly having a gun or any other weapon. *Ex. P (O.E.M.C. report); Ex. N, (McKenna Dep) p. 99: 3-17; Def's Ex. B. (Cartwright Dep.) at p. 24: 3-20; p. 26, 16-20; Def's Ex. F (Bubacz' Dep.) at p. 18: 10-20; at pp. 20-21: 23-24, 1-3.*

**RESPONSE:** Defendants admit that, at the time when the suspect dropped the gun into the dumpster, McKenna gave no other description of the suspect other than he was, male, black 6'2"-6'3", wearing a white t-shirt, blue jeans and white gym shoes. Defendants deny the implication that McKenna related the *only observations* he made about the suspect. Defendants

deny that *Def's Ex. B. (Cartwright Dep.) at p. 24: 3-20; p. 26, 16-20; Def's Ex. F (Bubacz' Dep.) at p. 18: 10-20; at pp. 20-21: 23-24, 1-3*. supports the remaining facts. Bubacz testified that he heard a member of his team was in a foot chase and that he did not remember hearing anything else about the foot chase other than the suspect was in custody. *Def's Ex. F (Bubacz' Dep.) at p. 18:10-20.* Cartwright testified that he did not know for what reason McKenna was chasing the individual *Def's Ex. B. (Cartwright Dep.) at p. 26, 16-20.* Neither of those statements support the fact that McKenna did not mention anything over the radio about the suspect having or possibly having a gun or any other weapon. Defendants admit that McKenna did not provide any information as to whether the suspect (or Denzel Nelson) had facial hair or glasses. That point is immaterial. Further, there is nothing in the record to establish that Denzel Nelson had facial hair or glasses on that day. As to Defendants admit that McKenna did not state whether the suspect was in his forties or teens. However, there is nothing in the record that establishes the suspect was in his forties. To the contrary, the record is clear that the suspect McKenna was chasing was young. *Def's 56.1 Stmt ¶ 9, citing Ex. E at 82:1-17; 85:5-8; 93:16-94:9; 97:8-98:9.* This is effectively admitted by Plaintiff. Defendants deny that the cited references supports those statements and therefore the disputed facts should be disregarded or stricken. Further, Defendants further deny that these facts raise any material issue of fact sufficient to support denial of Defendants' motion for summary judgment.

     9.     As Denzel stood on the corner, he saw a man run at full speed out of the alley across the street from where he was standing. The man ran out of the mouth of the alley, turned right, and then ran in the opposite direction of where Denzel stood at the corner. When the man got to the corner of 80th and Aberdeen (the next block over from Carpenter), the man turned right and disappeared around the corner. Denzel watched the suspect for about ten seconds before he started to walk back to the Barnes' residence. *Ex. M (Denzel's Dep.) at p. 68: 11-24; at p. 70: 9-18; at p. 71: 3-9; at p. 73: 12-22; at p. 74: 3-13.*

Case: 1:08-cv-04754 Document #: 95 Filed: 03/23/10 Page 6 of 19 PageID #:1401

**RESPONSE:** Defendants dispute that the cited testimony establishes the facts as stated above. The cited testimony establishes that Denzel Nelson testified he was walking northbound on 79th, on the east side of the street and that he observed a person run full speed out of the alley and run west and then north on Aberdeen. The cited testimony further establishes that Denzel was walking from the corner to 7951 S. Carpenter when he saw this person, and that did not observe the person for more than 10 seconds. Because the cited testimony does not establish the facts as asserted in Plaintiff's ¶ 9, this paragraph should be disregarded or stricken, as it does not establish any material issue of fact which support denial of Defendants' Motion for Summary Judgment.

10. Some time after the man disappeared around the corner, Denzel saw a large, out-of-breath and tired-looking uniformed officer (Defendant McKenna) come out of the same alley, jogging and looking tired. McKenna was gasping for air and sweating profusely. *Ex. M (Denzel's Dep.) at p. 74: 15-24; at pp. 77-78: 16-24, 1-9; Ex. Q (Crim. Trial Transc.) at p. 40: 9-11; Def's Ex. I (Merkel Dep.) at p. 22:5-12; Ex. O (Van Dyke Dep.) at p. 74: 13-17; pp. 102-103: 17-24, 1-4*.

**RESPONSE:** Defendants admit that Denzel testified that "seconds later" he observed an officer (McKenna) jogging slowly out of the alley and that Denzel assumed (McKenna) was tired because he was running slowly. Defendants further admit that McKenna was breathing hard and sweating heavily. Defendants deny the exhibits cited support the fact that he observed McKenna run out of the same alley and the remaining facts and therefore they should be disregarded. Defendants further deny that these facts raise any material issue sufficient to support denial of Defendants' motion for summary judgment.

11. Defendant McKenna, not knowing in which direction the suspect went, saw Denzel standing on the corner in plain sight and looking right at him. When McKenna saw Denzel, he was just standing and looking not doing anything. *Ex. Q (Crim. Trial Transc.) at p. 26: 8-16; at p. 30:15-21; Ex. N (McKenna Dep.) at pp. 127-128: 22-24, 1-2*.

**RESPONSE**: Admit.

12. McKenna pointed at Denzel but did not say anything. Not knowing exactly what was happening, yet seeing a police officer pointing at him, Denzel remained where he stood, and put his hands up. *Ex. M (Denzel's Dep.) at p. 77: 10-12; at p. 86: 20-24*.

**RESPONSE**: Defendants admit that McKenna pointed at Denzel. Defendants further admit that Denzel stopped walking at some point. Defendants deny that *Ex. M (Denzel's Dep.) at p. 77: 10-12* supports the fact that McKenna did not say anything. Denzel Nelson testified that he did not hear McKenna say anything at the time he was pointing at Denzel. *Ex. M (Denzel's Dep.) at p. 77: 10-12*. McKenna said, "grab him," and "[t]hat's the guy. That's the guy that ran from me." *Def's Ex. I (Merkel Dep.) at p. 22:16-20. Def's Ex. B (Cartwright Dep.) at p. 33:1-9*. As such, that portion of ¶12 should be disregarded or stricken. Defendants deny that Plaintiff put his hands up when McKenna pointed at him. Plaintiff testified that he put his hands up when the officers were exiting the car. Plaintiff testified that when the officers exited the car, he had stopped and was facing north and no longer looking west, but looking north. *Ex. M (Denzel's Dep.) at p. 86:20-87:7*.

13. When they arrived on the scene, Defendants Merkel and Cartwright jumped out of their car, ran at Denzel, and tackled him face forward to the ground. Denzel was standing still with his hands in the air when Merkel and Cartwright Tackled him. *Ex. M (Denzel Dep.) at pp. 87-88:8-24, 1-5; Ex. U (Ryan Barnes Affidavit)*.

**RESPONSE**: Defendants deny that the exhibits support the facts as stated above and the plaintiff's characterization of the cited testimony. Denzel testified that the officers exited their car, came up behind him, "tripped him to the grass" by putting their foot in front of his foot and "pushing him to the ground" and then "tackled him in the grass." *Ex. M (Denzel Dep.) at pp. 87-88:8-24, 1-7*. There is no evidence that Denzel was tackled "face forward" to the ground.

Additionally, Plaintiff testified that his left shoulder hit the ground. *Ex. M (Denzel Dep.) at p. 89: 1-11.* Defendants further deny that these facts raise any material issue of fact sufficient to support denial of Defendants' motion for summary judgment.

14. Merkel and Cartwright did not say anything to Denzel or give him any orders, instructions, or commands prior to tackling him. Cartwright and Merkel did not know for what reason Officer McKenna was chasing an individual at the time of the arrest nor had they any reason to believe Denzel was armed with a gun or any other weapon. *Ex. M (Denzel Dep.) at p.85: 15-23; at p. 92: 3-12; Def's Ex. B. (Cartwright Dep.) at pp. 20-21:19-24, 1-8; at p. 24: 3-20; at p. 26: 16-20; Ex. P (O.E.M.C. Report); Def's Ex. F (Bubacz' Dep.) at p. 18: 10-20; at pp. 20-21: 23-24, 1-3.*

**RESPONSE:** Plaintiff's ¶ 14 fails to comply with L.R. 56.1(b)(3) and portions identified as follows should be disregarded or stricken. Defendants refer the court to the General Objections raised in their L.R. 56.1 Reply. Defendants admit that Merkel did not say anything to Plaintiff from the time he exited the police car to the time he was taken into custody. Defendants deny that the cited testimony establishes that Cartwright did not say anything to him or give any orders, instructions or commands prior to taking him into custody. Defendants admit that, at the time Denzel was taken into custody, Merkel and Cartwright did not have personal knowledge of why McKenna was in a foot chase. Defendants deny that the cited testimony establishes that Cartwright did not have any reason to believe that Denzel was armed with a gun or any other weapon. The cited testimony establishes that Cartwright testified that he could not recall specifically hearing anything over the radio other than the area of the chase and a description of the suspect. Defendants deny that any testimony about what Bubacz heard over the radio establishes what Merkel and Cartwright knew or what they had reason to believe, as it is both speculative and conclusory. Therefore, this should be disregarded. Further, Defendants deny that the testimony cited establishes the fact that Merkel did not know for what reason McKenna

was chasing the suspect or whether the suspect had a gun or any other weapon. As such, this statement should also be disregarded or stricken. Lastly, Defendants deny that what is contained in the OEMC report establishes what Merkel or Cartwright knew or had reason to believe. This document should also be disregarded.

15. When Merkel and Cartwright arrested Denzel, he was not sweating profusely, out-of breath, or displaying signs of exhaustion consistent with having just been running from the police. *Ex. S (Denzel Affidavit)*.

**RESPONSE:** Defendants deny this statement to the extent that it does not comply with LR56.1(b)(3), is conclusory and contains improper argument, ("displaying signs of exhaustion consistent with having just been running from the police") which should be disregarded or stricken. The record reflects that Merkel noticed that Denzel had sweat on his forehead and dripping down his face and that he was breathing heavily. *Def's 56.1 Stmt ¶ 24, citing Ex. I at 28:19-29:16; 41:15-42:1.*

16. McKenna then ran to where Merkel and Cartwright had tackled Denzel and "jumped them." Merkel, Cartwright and McKenna pulled Denzel up to a standing position by his wrists/arms, hurting his shoulder, wrists, and back in the process. *Ex. Q (Crim. Trial Transc.) at p. 27:3-12; Ex. M (Denzel Dep.) at p. 89:1-11; at p. 94: 8-11; at p. 178: 4-24; Def's Ex. A (Complaint) at ¶ 19*.

**RESPONSE:** Defendants deny this statement to the extent that it does not comply with LR56.1(b)(3), is conclusory and contains improper argument, as it does not establish the meaning of "jumped them." Defendants deny that the record establishes that McKenna did anything to physically assist in handcuffing the Plaintiff or taking him into custody. The record establishes that McKenna had not yet arrived when Plaintiff was taken into custody by Merkel and Cartwright, as Plaintiff testified that McKenna did not help pull him up, but that he was "walking over there" after they (Merkel and Cartwright) picked him up, and that once Plaintiff was on his

feet, that is when McKenna came over and put his hand on Plaintiff's chest and felt his heartbeat. *Pltf's Resp. to Def's 56.1 ¶25. Ex. M (Denzel's Dep.) at pp. 92-93: 16-24, 1-19; at pp. 93-94: 24,1-2*; *Ex. M (Denzel Dep.) at p. 94: 8-11* The only part of the record that establishes that McKenna touched Plaintiff is when he felt Plaintiff's heartbeat. *Id.* Additionally, defendants deny that any part of the record cited supports that Plaintiff was pulled up by his wrists, or that he was hurt at the moment he was pulled to a standing position. As such, these statements are not supported and should be disregarded.

      17.    Denzel immediately told them the guy they were looking for had just run down Aberdeen. He told them that he, Denzel, had just seconds before, walked out of the 7951 S. Carpenter house where he was with his friends. *Ex. M (Denzel Dep.) at p. 95: 6-22; at p. 97: 3-5; at p. 215: 12-20*.

      **RESPONSE:** Defendants admit that Plaintiff testified that he told the officers "it wasn't me," "I seen the guy running down the street, he ran the other way" and "I seen the guy running down...the other street, and by telling them I was at my girlfriend house and I just left out." Defendants deny that cited testimony establishes that Plaintiff told them that the suspect they were looking for had just run down Aberdeen, or that Denzel told them that he had just seconds before walked out of the 7951 S. Carpenter house where he was with his friends. As such, those unsupported facts should be disregarded or stricken.

      18.    There were several people outside on the block during this entire incident. Ryan Barnes was still on his front steps and had seen Denzel leave, walk to the corner, and then get tackled by Defendant Officers. Though he was just feet away and able to verify Denzel's assertions, Merkel, Cartwright and McKenna did not ask him, or any of the other eyewitnesses, any questions. *Ex. R (Gabriel Bridges Dep.) at pp. 9-11; Ex. U (Ryan Barnes Affidavit)*.

      **RESPONSE:** Plaintiff's ¶18 does not comply with L.R. 56.1(b)(3), as it does not cite to a specific portion of the record, but rather to three pages of testimony by Gabriel Bridges, and

because it contains conclusory statements and inadmissible hearsay and those portions should be disregarded or stricken. Defendants deny that the cited testimony establishes that Gabriel Bridges witnessed anything that occurred on the date of Denzel's arrest. Rather, the cited material establishes that Gabriel Bridges testified that he had a conversation with Mr. Thedford and states what he told Mr. Thedford. *Ex. R. at pp. 9-11.* Defendants deny that the testimony cited establishes that there were several people outside on the block during this entire incident. Defendants deny that the affidavit of Ryan Barnes establishes that he had seen Denzel leave and walk to the corner, that he was just feet away, or when he was feet away. Plaintiff's *Exhibit U* is vague and only states that Ryan was with Denzel just before he was arrested. It does not state when Ryan Barnes first sat on the porch. Defendants deny that the record cited establishes that they did not ask Ryan Barnes any questions. *Exhibit U.* For the reasons stated above, and in Defendants' General Objections in their *L.R. 56.1 Reply*, Plaintiff has failed to comply with L.R.56.1(b)(3), and should be disregarded or stricken.

19. Instead, Merkel and Cartwright placed Denzel in their squad car and drove him down the block to where Van Dyke had detained the occupants of the Pontiac. There, Defendant Officers conducted a "show up" with Denzel. All three of the occupants of the vehicle told Defendant Officers they had the wrong guy. *Ex. M (Denzel Dep.) at p. 98: 1-20; at pp. 99-100: 7-24; 1-9; Ex. Q (Crim. Trial Transc.) at pp. 64-65:16-24, 1-3*.

**RESPONSE:** Plaintiff has failed to comply with L.R.56.1(b)(3). Defendants object to ¶ 19 because it contains inadmissible hearsay, which should be disregarded or stricken. *Ex. Q (Crim. Trial Transc.) at p. 65: 2-3*. Defendants admit that Denzel was placed into Merkel and Cartwright's squad car. Defendants also admit that Denzel was eventually taken in the squad car back to the scene of the traffic stop. Defendants further admit that Aaron Rodgers, the driver of

the curbed car, told the officers that he did not know Plaintiff; he was not the man. Defendants admit Plaintiff testified that they brought someone to the car who was arrested "to see." Defendants deny that a "show-up" occurred and deny the sequence of events as suggested by Plaintiff. *Ex. M (Denzel Dep.) at p. 98: 1-20*. The facts establish that Merkel, Cartwright, Denzel and McKenna relocated immediately to the dumpster to retrieve the gun before going to the Pontiac, where Van Dyke was with the other occupants of the car.. *See Ex. E at 160:6-24; Ex. C at 35:11-19.*

20. Other independent civilian eye-witnesses who had seen all, or portions of the traffic stop, the foot chase, and Denzel's arrest, approached Defendant Officers and told them Denzel was not the one McKenna had been chasing. *Ex. R (Gabriel Bridges Dep.) at pp. 9-11; Ex. U (Ryan Barnes Affidavit); Ex. F (Bubacz Dep.) at pp. 28-29, 22-24, and 1-20*.

**RESPONSE:** Defendants object to ¶ 20, to the extent that it is repetitive of ¶ 18. ¶ 18 does not comply with L.R. 56.1(b)(3), as it does not cite to a specific portion of the record, but rather to three pages of testimony by Gabriel Bridges, and because it contains conclusory statements and inadmissible hearsay. Defendants deny that the cited testimony establishes that other independent civilian eye-witnesses who had seen all, or portions of the traffic stop, the foot chase, and Denzel's arrest, approached Defendant Officers and told them Denzel was not the one McKenna had been chasing. Defendants deny that the cited testimony, *Exhibit R,* establishes that Gabriel Bridges witnessed anything that occurred on the date of Denzel's arrest, or that he spoke to any officers that day. Rather, the cited material recounts a conversation between Mr. Bridges and Plaintiff's attorney, Mr. Thedford, which establishes that Gabriel Bridges testified that he had a conversation with Mr. Thedford and that during that conversation, he told Mr. Thedford that he "went to the police officers and..." told them "I think they got the wrong guy."

*Ex. R. at pp. 9-11.* This testimony does not establish what happened that day. It establishes only that at a later time, Bridges said those things to Mr. Thedford, and nothing more. Because *Exhibit R* establishes that Mr. Bridges had a conversation with Mr. Thedford, and what he told Mr. Thedford, *Exhibit R* should be disregarded or stricken. *Exhibit U* only establishes the fact that Ryan Barnes observed Denzel at the time he was taken into custody, and nothing more. *Exhibit U* also contains inadmissible hearsay, as it reports what other, unidentified people told the police, and it should be disregarded.

21.     Nevertheless, Merkel and Cartwright transported Denzel to the station where he was processed by Van Dyke and McKenna, in the presence of Merkel and Cartwright. McKenna and Van Dyke signed off on the police reports. McKenna, Merkel, Cartwright, and Van Dyke continued to talk about the incident at the station. Denzel was charged with felony possession of a handgun, which Defendant Officers claim to have recovered from a garbage can in the alley. *Ex. M (Denzel Dep.) at pp. 124-125: 17-24, 1-2; at p. 140: 19-22; Ex. N (McKenna Dep.) at p. 182: 17-24; Ex. O (Van Dyke Dep.) at pp 121-122: 16-24, 1-21; at pp. 126-127: 15-24, 1-8; at pp. 130-131: 6-24, 1-8; Def's Ex. K (Arrest Report); Ex. W (Certified Disposition).*

**RESPONSE:**     Defendants admit that Merkel and Cartwright transported Denzel to the station and took him to the processing room. Defendants further admit that Denzel was charged with unlawful possession of a handgun, which the arrest report states was recovered from a garbage container. Defendants deny that the evidence cited establishes that Denzel was processed by Van Dyke and McKenna in the presence of Merkel and Cartwright. Defendants further deny that the evidence cited establishes that McKenna, Van Dyke, Merkel and Cartwright "continued to talk about the incident at the station." The remainder of Plaintiff's ¶ 21 does not comply with L.R.56.1(b)(3), because the testimony cited does not support the remaining factual statements in ¶ 21. Therefore, they are denied, and those portions should be disregarded or stricken.

-13-

22. When Bubacz and Spacek arrived on the scene of Plaintiffs arrest, McKenna, Van Dyke, Merkel and Cartwright were conversing with each other by the Pontiac, and there were three or four African American males that may have been wearing blue jeans and a white t-shirt in the area of the officers. *Def's Ex. F (Bubacz Dep.) at pp. 25-26, 20-24, and 1-15*.

**RESPONSE:** The cited testimony establishes that Bubacz saw three or four young African American males on 79th Street, and that he did not remember what they were wearing. Plaintiff does not establish that any other African American males were wearing jeans and a white t-shirt. Defendants deny that the remaining facts in ¶ 22 are supported by the testimony cited. Therefore the remaining portions of ¶ 22 do not comply with LR56.1(b)(3) and should be disregarded or stricken.

23. Spacek and Bubacz, remained on the scene for a half-hour. Spacek and Bubacz testified their only role was to guard the Pontiac until it was towed. A tow for the Pontiac was not ordered until 8:30, after Spacek and Bubacz had already left. *Ex. F (Bubacz Dep.) at p. 54:13-17; Ex. O (Van Dyke Dep.) at p. 117:13-23; at pp. 118-119:14-24, 1-11*.

**RESPONSE:** Defendants admit that *Ex. O (Van Dyke Dep.) at pp. 118-119:14-24, 1-11* establishes that the tow report reflects that the tow was ordered at 8:30 p.m. on the night of the 21st. Defendants deny that the testimony cited supports the remaining facts in ¶ 23. Therefore the remaining portions of ¶ 23 do not comply with LR56.1(b)(3) and should be disregarded or stricken.

24. Denzel saw three other officers looking in and around the alley between Carpenter and Aberdeen after his arrest, that were not Merkel, Cartwright, McKenna, or Van Dyke. Ex. M (Nelson Dep.) at pp. 125: 3-16; at p. 126: 1-19; at p. 127: 1-17.

**RESPONSE:** Admit.

25. Denzel, who had never before been arrested for anything, spent the night in jail with criminals. During his senior year in high school, Denzel had to miss school on several occasions to attend court on his criminal case at 26th and California. While his criminal case was pending, Denzel worried about a felony conviction and whether he would still be able to go to college. Ultimately, Denzel was forced to stand trial and was found not guilty on all charges.

*Def's Ex. A (Complaint) at ¶¶ 14 and 21; Ex. M (Denzel's Dep.) at p. 187: 10-15; Ex. V (Crim. Court Order); Ex. W (Disposition of Crim. Trial).*

**RESPONSE:** Admit.

26. At the criminal trial McKenna never testified that he saw the suspect glance back over his shoulder, stop near the south end mouth of the alley and turn to face him, or that he saw the suspect's face or the front side his body at any time prior to McKenna pointing at Denzel from the south end mouth of the alley. *Ex. Q (Crim. Trial Transc.) at pp. 5-32*.

**RESPONSE:** Defendants object to ¶ 26 because it does not comply with L.R. 56.1(b)(3), as it cites 27 pages of testimony, is conclusory and contains argument. "[A] lawsuit is not a game of hunt the peanut" and "'judges are not like pigs, hunting for truffles buried' in the record." *Buttron v. Sheehan,* at *4 (citations omitted). Further, the statements of "fact" in ¶ 26 rely on what is *absent* from the record rather than what is contained in the record, in violation of L.R. 56.1 (b)(3). McKenna was not asked the same questions at the criminal trial that he was asked at his deposition. For the reasons stated above, and in Defendants' General Objections, in their Reply to Plaintiff's Response to Defendants 56.1 Statement of Facts, ¶ 26 should be disregarded or stricken.

27. At the criminal trial McKenna testified that after the suspect tossed the gun into a dumpster in the alley, the suspect ran off, and McKenna went to the dumpster and looked inside it. When McKenna looked south again, "at that point [he] lost sight of the offender." *Ex. Q (Crim. Trial Transcript) at pp. 24-26; at p. 30: 15-21*.

**RESPONSE:** Admit.

28. At the criminal trial, Van Dyke never testified seeing the suspect a second time during the foot chase while he was still standing at the police car at the north end of the Carpenter block. Neither Van Dyke nor McKenna testified that the foot chase included a circle around one of the buildings on the west side of Carpenter. *Ex. Q (Crim. Trial Transc.) at pp. 5-32; at pp. 105-120.*

**RESPONSE:** Defendants object to ¶ 28 because it does not comply with L.R. 56.1(b)(3), as it cites 42 pages of testimony, is conclusory and contains argument. "[A] lawsuit is not a game of hunt the peanut" and "'judges are not like pigs, hunting for truffles buried' in the record." *Buttron v. Sheehan,* at *4 (citations omitted). Further, the statements of "fact" in ¶ 28 rely on what is *absent* from the record rather than what is contained in the record, in violation of L.R. 56.1 (b)(3). Van Dyke was not asked the same questions at the criminal trial that he was asked at his deposition. For the reasons stated above, and in Defendants' General Objections, in their Reply to Plaintiff's Response to Defendants 56.1 Statement of Facts, ¶ 28 should be disregarded or stricken.

29. At the criminal trial, Van Dyke was unable to remember what color shirt the suspect was wearing. *Ex. Q (Crim. Trial Transc.) at p. 115: 2-5*.

**RESPONSE:** Defendants object to ¶ 29 as misleading and conclusory. The cited testimony from the criminal trial states: Q: You saw what he was wearing, is that right? A: Yes. Q: What was he wearing? A: I don't remember at this time. As such, Plaintiff's statement is misleading because Van Dyke did not recall anything that the suspect was wearing at the time he testified at the criminal trial

30. McKenna testified at his deposition that when the suspect exited the vehicle and ran northbound he glanced back over his right shoulder. *Ex. N (McKenna Dep.) at p. 83:11-20*.

**RESPONSE:** Admit.

31. Van Dyke testified at his deposition that when the suspect exited the vehicle and ran northbound he glanced back over his left shoulder. *Ex. O (Van Dyke Dep.) at p. 45: 9-15*.

**RESPONSE:** Admit.

32. Van Dyke's testified at his deposition that when the suspect allegedly ran around the house Van Dyke did not see a gun. *Ex. O (Van Dyke Dep.) at p. 78:16-24*.

**RESPONSE:** Defendants deny that the cited testimony establishes that Van Dyke did not see a gun. *Ex. O (Van Dyke Dep.) at p. 78:16-24*. Therefore ¶ 32 should be disregarded or stricken.

33. The distance from the location of the start of the foot chase until the south mouth of the alley was approximately 703.8 feet. *Ex. X (Slevnik report)*.

**RESPONSE:** Defendants object to ¶ 33 because it fails to comply with L.R. 56.1(b)(3) in that it cites to a document which constitutes inadmissible hearsay–an unsworn report by Plaintiff's investigator being offered for the truth of the matter asserted. Defendants refer the court to its General Objections contained in their Reply to Plaintiff's Response to Defendant's Rule 56.1 Statement of Facts. *Exhibit X* should be disregarded or stricken.

34. Approximately three minutes and twenty seconds elapsed between the time McKenna radioed in that he was chasing the suspect until the time that one of Defendant Officers radioed in that they had someone in custody. *Ex. P (OEMC report) at entries 19:19:57 and 19:23:14*.

**RESPONSE:** Defendants object to ¶ 34 and Exhibit P to the extent that it lacks foundation and does not establish the actual times. Rather, it establishes only when those events were reported and recorded. Therefore ¶ 34 is conclusory. As such, *Exhibit P* should be disregarded.

35. On August 21, 2007, there were either iron or chain link fences running behind all the houses on the west side of Carpenter street between 79th and 80th Streets. These fences existed for a few years prior to August of 2007, and were erected in an effort to prevent people from accessing the gangways or residential property between Carpenter and the west alley. Since the erection of the fences crime in that particular area has been minimal. On August 21, 2007, this fencing was in place and would have made it impossible for someone to run from the alley eastbound to Carpenter Street without having to climb over a fence. *Ex. T (Clark Jameson Affidavit)*.

**RESPONSE:** Defendants object to ¶ 35 and *Exhibit T* as speculative and conclusory.

Defendants deny that *Ex. T (Affidavit Jameson)*. Further, *Exhibit T* states only that there was fencing running behind all the houses on the west side of Carpenter. It also states that the fencing was "in place," but does not state that it was impenetrable and there were no breaks or gaps between fences. Nor does it state that there were no gates in the fencing. Moreover, *Exhibit T* does not specifically speak to the property located at 7926 S. Carpenter, where the suspect ran around the building. As such, it should be disregarded.

**DATED: MARCH 23, 2010**                                     Respectfully submitted

                                                                      /s/ Gail L. Reich
                                                                      GAIL REICH
                                                                       Assistant Corporation Counsel
                                                                       Attorney for Defendant Officers

30 N. LaSalle Street
Suite 900
Chicago, Illinois 60602
(312) 744-1975
(312) 744-6566 (Fax)
Atty. No. 06279564

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DENZEL NELSON, | ) | |
| | ) | 08 C 4754 |
| Plaintiff, | ) | |
| | ) | Judge St. Eve |
| v. | ) | |
| | ) | Magistrate Judge Cox |
| CITY OF Chicago, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE OF FILING AND CERTIFICATE OF SERVICE**

TO:  Tony Thedford, David Selmer, Torreya Hamilton
10 S. Lasalle St., Suite 1000
Chicago, Illinois  60603

**PLEASE TAKE NOTICE** that on this 23rd day of March 2010, I have caused to be e-filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division **DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS** , a copy of which is herewith served upon you.

I hereby certify that I have served this notice and the attached document  by causing it to be delivered by electronic means in compliance with Local Rule 5.9 to the person named above at the address shown this 23rd day of March 2010.

Respectfully submitted,

/s/ Gail L. Reich
GAIL L. REICH
Assistant Corporation Counsel

30 N. LaSalle Street
Suite 900
Chicago, Illinois 60602
(312) 744-1975
(312) 744-6566 (Fax)
Atty. No. 06279564