**IN THE UNITED STATED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DENZEL NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 C 4754 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMY J. ST. EVE, District Court Judge:

On October 20, 2008, Plaintiff Denzel Nelson filed the present seven-count Complaint

alleging that Defendant Chicago Police Officers violated his Fourth Amendment rights, as well

as state law claims of battery, false imprisonment, and malicious prosecution.[1]  Before the Court

is Defendant Officers' Motion for Summary Judgment pursuant to Federal Rule of Civil

Procedure 56(c).  For the following reasons, the Court grants Defendant Officers' summary

judgment motion and dismisses this lawsuit in its entirety.

**BACKGROUND**

**I.    Northern District of Illinois Local Rule 56.1**

When determining summary judgment motions, the Court derives the background facts

from the parties' Local Rule 56.1 statements.  Specifically, Local Rule 56.1 assists the Court by

"organizing the evidence, identifying undisputed facts, and demonstrating precisely how each

side propose[s] to prove a disputed fact with admissible evidence."  *Bordelon v. Chicago Sch.*

---

[1] In his Complaint, Nelson also alleged a policy claim against the City of Chicago that he
voluntarily dismissed.  (R. 98-1.)  Accordingly, the City of Chicago is no longer a Defendant to
this lawsuit and Nelson's policy claim as alleged in Count IV is dismissed.

*Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1(a)(3) requires the

moving party to provide "a statement of material facts as to which the moving party contends

there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). "The

opposing party is required to file 'a response to each numbered paragraph in the moving party's

statement, including, in the case of any disagreement, specific references to the affidavits, parts

of the record, and other supporting materials relied upon." *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)).

Also, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of

additional facts that require the denial of summary judgment. *See Ciomber v. Cooperative Plus,*

*Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008).

The purpose of Rule 56.1 statements is to identify the relevant admissible evidence

supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan,* 467

F.3d 1057, 1060 (7th Cir. 2006). Moreover, the requirements for responses under Local Rule

56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material

facts asserted." *Bordelon,* 233 F.3d at 528. In addition, the Court may disregard statements and

responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., L.L.C.*,

401 F.3d 803, 809-10 (7th Cir. 2005); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 604

(7th Cir. 2006) ("district courts are entitled to expect strict compliance with Local Rule 56.1").

Finally, district courts may only consider admissible evidence in assessing summary judgment

motions. *See Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009). With these standards in

mind, the Court turns to the relevant facts of this case.

## II.     Relevant Facts

The parties in this matter are Plaintiff Denzel Nelson and Defendant Chicago Police

Officers Thomas McKenna, Jason Van Dyke, Joseph Merkel, George Spacek, Michael Bubacz, and Jason Cartwright. (R. 67-1, Defs.' Rule 56.1 Stmt. Facts ¶ 3.) On August 21, 2007, Officers McKenna, Van Dyke, Cartwright, Merkel, Bubacz, and Spacek were members of the Chicago Police Department's Targeted Response Unit ("TRU"). (*Id.* ¶ 4.) TRU is a specialized unit, which is mission-driven to look for guns and drugs. (*Id.*) Defendant Officers began work at approximately 6:00 p.m. and were assigned to patrol the Sixth District in uniform and in marked squad cars. (*Id.*) That day, Officers Bubacz and Spacek were partnered with Officer Massas, who is now deceased. (*Id.* ¶ 5.) Officers Cartwright and Merkel were partnered, and Officers McKenna and Van Dyke were partnered. (*Id.*)

At approximately 7:00 p.m. on August 21, 2007, while on routine patrol in the Sixth District, Officer McKenna's and Officer Van Dyke's attention was drawn to a two-door Pontiac Grand Prix, which was traveling eastbound on 80th Street. (*Id.* ¶ 6.) In particular, Officers McKenna and Van Dyke observed four black males in the car with an air freshener hanging from the rear view mirror obstructing the driver's view. (*Id.* ¶ 7.) Because this is a minor traffic violation, Officers McKenna and Van Dyke initiated a traffic stop by operating the emergency lights on their squad car. (*Id.*) The Pontiac Grand Prix did not stop immediately, but continued eastbound on 80th Street then turned northbound onto South Carpenter Street, where it came to a stop at approximately 7926 South Carpenter Street. (*Id.* ¶ 8.)

At that time, the driver's side door opened and a black male, wearing a white t-shirt, blue jeans, and white gym shoes, exited the car and began to flee. (*Id.* ¶¶ 9, 10.) Officer McKenna was about 30 to 40 feet away from the suspect when he began to chase the suspect and ordered the suspect to stop. (*Id.* ¶ 11; R. 82-1, Pl.'s Rule 56.1 Stmt. Facts ¶ 5.) Officer McKenna then

3

chased the suspect northbound on the west sidewalk on South Carpenter Street and eventually followed him to the west alley between Carpenter and Aberdeen Streets. (Defs.' Stmt. ¶ 12; Pl.'s Stmt. ¶ 6.) Meanwhile, Officer Van Dyke stayed behind to secure the Grand Prix and the remaining occupants. (Pl.'s Stmt. ¶ 6.) As Officer McKenna was chasing the suspect, he called over the radio that he was engaged in a foot chase and gave directions and a description of the suspect as a black male wearing a white t-shirt, blue jeans, and white gym shoes. (Defs.' Stmt. ¶ 12; Pl.'s Stmt. ¶ 8.) As Officer McKenna rounded the corner, he saw that the suspect had a gun in his right hand. (Defs.' Stmt. ¶ 12.) The suspect continued to run at which time Officer McKenna identified himself as a police officer and told the suspect to stop. (*Id*. ¶ 13.) Officer McKenna then radioed that the suspect was armed and gave his location. (*Id*.)

Shortly thereafter, Officer McKenna saw the suspect throw a gun in a dumpster in the alley after which Officer McKenna went to the dumpster to look for the gun. (*Id*. ¶¶ 15, 16.) Officer McKenna testified that he observed the suspect turn back to look at him at the end of the alley. (*Id*. ¶ 16.) During the time Officer McKenna was looking in the dumpster, he did not see the gun and he lost sight of the suspect for about ten seconds. (*Id.* ¶ 17; Pl.'s Stmt. ¶ 27.) Officer McKenna then walked quickly to the end of the alley and when he reached the end of the alley, he looked left and saw a black male dressed in a white t-shirt, blue jeans, and white gym shoes standing near the corner of 80th and Carpenter Streets looking back at him. (Defs.' Stmt. ¶¶ 18, 19; Pl.'s Stmt. ¶ 11.) Officer McKenna testified that he believed it was the same person he had seen fleeing the Pontiac Grand Prix with the gun. (Defs.' Stmt. ¶ 19.)

During that same time period, Nelson, who was wearing a white t-shirt, jeans, and white gym shoes, was standing alone in the area of 7951 South Carpenter Street. (*Id*. ¶ 20.) Upon

4

hearing the call over the radio that one of their units was in a foot chase, Officers Cartwright and Merkel drove to the area.  (*Id.* ¶ 21.)  As Officers Cartwright and Merkel arrived at the scene, Officer McKenna pointed over at Nelson, who he thought was the suspect.  (*Id.* ¶ 22.)  Officers Cartwright and Merkel then stopped their car where Nelson was standing, grabbed his arms, tripped him to the ground, and took him into custody.  (*Id.* ¶ 23.)  Thereafter, one of the officers placed Nelson in handcuffs and then both officers put Nelson in the squad car.  (*Id.* ¶ 25.)  The officers then drove Nelson to the alley where the other Chicago Police Officers were looking for the gun.  (*Id.*)  At that time, Officer Merkel recovered the gun – which was fully loaded – from the dumpster.  (*Id.* ¶¶ 26, 27.)  During the time of his arrest, Nelson was a block from the dumpster where the gun was located and Nelson did not have a Firearm Owner's Identification card or any other documentation enabling him to carry a gun.  (*Id.* ¶ 28.)  Also, at the time of his arrest, there was no one else in the alley or immediate area who met the description of the suspect other than Nelson.  (*Id.* ¶ 24.)

During his arrest, Nelson denied that he was the suspect.  (*Id.* ¶ 29.)  Nelson also told the police officers that he had seen the suspect run down the street and that he had just come from a friend's house.  (Pl.'s Stmt. ¶ 17.)  After Nelson's arrest, the occupants of the Grand Prix and another individual, Ryan Barnes, told the police officers that they had the wrong guy.  (*Id.* ¶¶ 19, 20.)  Officers Merkel and Cartwright nevertheless transported Nelson to the police station and Officers Van Dyke and McKenna processed Nelson.  (*Id.* ¶ 21.)  On the way to the police station and during processing, Nelson told the police officers that the handcuffs were tight on his wrists. (Defs.' Stmt. Facts ¶ 39.)

Meanwhile, Defendant Officers Spacek and Bubacz proceeded to the scene after they

5

heard the radio call, but about halfway there, they heard another radio call notifying them that the suspect was in custody. (*Id.* ¶ 31.) Officers Spacek and Bubacz eventually arrived at the scene of Nelson's arrest and remained on the scene for a half an hour to watch the Pontiac Grand Prix, which was eventually towed. (*Id.* ¶¶ 36, 37; Pl.'s Stmt. ¶¶ 22, 23.) In addition, Officers Spacek and Bubacz did not write or review any reports for Nelson's arrest. (Defs.' Stmt. ¶ 42.) It is undisputed that Officers Spacek and Bubacz did not arrest Nelson, observe him commit any crimes, or take him into custody. (*Id.*)

Nelson's case eventually went to trial where he was found not guilty on all charges. (Pl.'s Stmt. ¶ 25.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"

*Anderson*, 477 U.S. at 255 (quotation omitted); *see also* Fed.R.Civ.P. 56(e)(2) (requiring adverse

party to "set out specific facts"). At summary judgment, the "court's role is not to evaluate the

weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the

matter, but instead to determine whether there is a genuine issue of triable fact." *National*

*Athletic Sportswear, Inc. v. Westfield Ins. Co.,* 528 F.3d 508, 512 (7th Cir. 2008).

## ANALYSIS

### I.      False Arrest/Failure to Intervene – Count II

In Count II of his Complaint and in response to the instant summary judgment motion,

Nelson contends that Defendant Officers McKenna, Van Dyke, Cartwright, and Merkel violated

his Fourth Amendment rights by falsely arrested him. *See* 42 U.S.C. § 1983. "Probable cause is

an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section

1983." *Stokes v. Board of Educ. of the City of Chicago,* 599 F.3d 617, 622 (7th Cir. 2010).

"Probable cause is determined from the facts known to the officers at the time of the arrest." *Fox*

*v. Hayes,* 600 F.3d 819, 838 (7th Cir. 2010). More specifically, "probable cause is a common-

sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a

court has enough information to warrant a prudent person to believe criminal conduct has

occurred." *Whitlock v. Brown,* 596 F.3d 406, 411 (7th Cir. 2010) (citing *Illinois v. Gates,* 462

U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "A police officer's probable cause

determination depends on the elements of the applicable criminal statute." *Stokes,* 599 F.3d at

622. Here, Defendant Officers arrested Nelson for aggravated unlawful possession of a weapon

pursuant to 720 ILCS 5/24-1.6(a), which states that a person may not carry "on or about his or

her person or in any vehicle or concealed on or about his or her person ... any pistol, revolver,

stun gun or taser or other firearm."

In support of his false arrest claim, Nelson argues that Officers McKenna and Van Dyke never got a good enough look at the suspect to identify him, and thus their identification of Nelson as the suspect cannot provide probable cause for his arrest for aggravated unlawful possession of a weapon. In particular, Nelson contends that Officers McKenna and Van Dyke were thirty to forty feet away when the suspect first got out of the Grand Prix and began to run with his back toward the police officers. Further, Nelson argues that the foot chase spanned over 700 feet and disputes whether the suspect turned back to look at Defendant Officers during the chase.

Whether Officers McKenna and Van Dyke got a "good enough look" at the suspect is only one factor in the probable cause calculus. Assuming that the officers did not get a "good enough look" at the suspect, the officers' made other relevant observations shortly before Nelson's arrest. These observations include that Officers McKenna and Van Dyke saw the suspect – a black male who was dressed in a white t-shirt, jeans, and white gym shoes – flee a traffic stop and run north on Carpenter Street. When Officer McKenna chased the suspect down the alley between Carpenter and Aberdeen Streets, he saw the suspect throw a gun into a dumpster after Officer McKenna had identified himself as a police officer and told the suspect to stop. Although Officer McKenna lost sight of the suspect for ten seconds when he looked in the dumpster for the gun, immediately thereafter, he walked to the end of the alley where the suspect had run and when he turned left, he saw a black male dressed in a white t-shirt, jeans, and white gym shoes standing near the corner of 80th and Carpenter Streets looking back at him. At that time, there was no one else in the immediate area that matched the suspect's description besides

8

Nelson. As such, Officer McKenna believed that Nelson was the same person he had seen with the gun.

Officer McKenna radioed other police officers two times during the chase. At the beginning of the chase, he called over the radio that he was engaged in a foot chase, gave directions, and gave a description of the suspect as a black male wearing a white t-shirt, blue jeans, and white gym shoes. After Officer McKenna saw a gun in ths suspect's hand, he radioed that the suspect was armed and gave his location. When Officers Cartwright and Merkel heard Officer McKenna's calls over the radio about the foot chase, they drove to the area of the chase. As Officers Cartwright and Merkel drove to the area, they saw Officer McKenna point at Nelson. Thereafter, Officers Cartwright and Merkel arrested and handcuffed Nelson.

Construing the facts and all reasonable inferences in Nelson's favor, Officer McKenna had enough information – based on his personal observation of the crime in progress – to warrant a prudent person to believe that Nelson had a firearm in violation of the Illinois aggravated unlawful possession of a weapon statute. *See* 720 ILCS 5/24-1.6(a). Even if Officers McKenna and Van Dyke did not see the suspect's face as Nelson argues, Officer McKenna saw the suspect flee a traffic stop, chased the suspect on foot, saw the suspect throw a gun in a dumpster, lost sight of the suspect for ten seconds, and then saw Nelson at the corner of 80th and Carpenter near the end of the alley where the chase took place. Nelson, like the suspect, was a black male wearing a white t-shirt, jeans, and white gym shoes. Although wearing a white t-shirt, jeans, and white gym shoes is not an unusual way to dress, evidence in the record reveals that there was no one else in the alley or immediate area who met the description of the suspect other than Nelson. Based on his personal observations, Officer McKenna thought that Nelson

9

looked like the suspect he had been chasing in the area of 80th and Carpenter Streets and who had just thrown a gun in a dumpster. Accordingly, Officer McKenna had probable cause to arrest Nelson for aggravated unlawful possession of a weapon under the Illinois statute.

In addition, based on the information Officers Cartwright and Merkel knew at the time of the arrest, including the information Officer McKenna radioed, Officers Cartwright and Merkel had probable cause to arrest Nelson. To clarify, "[w]hen law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine." *United States v. Sawyer,* 224 F.3d 675, 680 (7th Cir. 2000); *see also United States v. Parra,* 402 F.3d 752, 764 (7th Cir. 2005) ("police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency."). Because Officers Cartwright and Merkel were in communication with Officer McKenna, who was involved in the chase, Officer McKenna's knowledge can be imputed to Officers Cartwright and Merkel. *See Sawyer*, 224 F.3d at 680.

Although Defendant Officers had sufficient information to establish probable cause under the circumstances, Nelson argues that they should have investigated the situation further because there was other information that dissipated probable cause. As the Seventh Circuit teaches, however, "once an officer learns sufficient trustworthy information establishing probable cause, he is entitled to rely on what he knows in pursuing charges or an arrest, and is under no further duty to investigate." *Beauchamp v. City of Noblesville, Ind.,* 320 F.3d 733, 744 (7th Cir. 2003); *see also Stokes,* 599 F.3d at 624 ("Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation"). In support of his argument, Nelson

10

relies on his statement to Officers Cartwright and Merkel that he had seen the suspect run down the street and that he had just come from his friend's house. Nelson's statement to the officers, however, did not trigger the Defendant Officers' duty to conduct further investigation because "criminal suspects frequently protest their innocence, and a suspect's denial of guilt generally is not enough to trigger a duty to investigate in the face of a reasonably believable witness and readily observable events." *Beauchamp*, 320 F.3d at 744. Put differently, "[o]nce an officer has established probable cause on every element of a crime, he need not continue investigating to test the suspect's claim of innocence." *Id.* at 745-46. This is especially true where the officers believed that the suspect was armed and had fled from law enforcement. Similarly, Nelson argues that after his arrest, the occupants of the Grand Prix and another individual told Defendant Officers that they had the wrong guy. When determining if there is probable cause, however, "it is not the function of the police to establish guilt; the responsibility of sorting out conflicting testimony and assessing the credibility of putative victims and witnesses lies with the courts." *Id.* at 745. Thus, although there was conflicting testimony that came out after Nelson's arrest, it was not clearly exculpatory evidence as Nelson suggests. *See Stokes,* 599 F.3d. at 624. Therefore, the Defendant Officers had probable cause to arrest Nelson despite this conflicting testimony.

Because Nelson has failed to establish a genuine issue of material fact for trial that Defendant Officers did not have probable cause to arrest him, his failure to intervene claim based on his false arrest against Defendant Officers, including Officer Van Dyke, also fails. *See Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation."). Moreover, because Nelson failed to raise a genuine issue of material fact that Defendant Officers

11

falsely arrested him in violation of the Fourth Amendment, the Court need not address Defendants Officers' qualified immunity arguments as to this claim. *See Bivens v. Trent,* 591 F.3d 555, 559-60 (7th Cir. 2010); *Williams v. Rodriguez,* 509 F.3d 392, 398 (7th Cir. 2007). Accordingly, the Court grants Defendant Officers' summary judgment motion as to Count II of Nelson's Complaint.

## II.     Excessive Force Claim/Failure to Intervene  – Count I

In Count I of the Complaint and in his response to Defendant Officers' summary judgment motion, Nelson argues that Officers Merkel and Cartwright used excessive force while arresting him and that Officer McKenna had a reasonable opportunity to intervene, but failed to do so.  "A claim that a police officer has used excessive force in the course of an arrest, investigatory stop, or other 'seizure' of a citizen is addressed to the reasonableness of the seizure, under the standards established by the Fourth Amendment."  *Gonzalez v. City of Elgin,* 578 F.3d 526, 539 (7th Cir. 2009).  "An officer's use of force is unreasonable from a constitutional point of view only if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.'"  *Id.* (citation omitted).  "Assessing whether the force used to effectuate a particular seizure is reasonable 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Stainback v. Dixon,* 569 F.3d 767, 772 (7th Cir. 2009) (quoting *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount

of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97.

Viewing the evidence and all reasonable inferences in Nelson's favor, he maintains that he had his hands in the air when Officers Merkel and Cartwright tripped or tackled him to the ground, pulled his arms behind him, put a knee in his back, handcuffed him, and then pulled him into a standing position. Further, Nelson asserts that Defendant Officers' conduct injured his wrists, shoulder, and back and that the handcuffs were too tight while Officers Merkel and Cartwright transported him to the police station and while Defendant Officers McKenna and Van Dyke processed him at the police station. Nelson testified that his back and wrists were sore and bothered him for a couple of days.

As discussed, Officers Merkel and Cartwright had probable cause to arrest Nelson, therefore, Nelson's argument that any force was unreasonable is without merit. In fact, "an officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest." *Stainback,* 569 F.3d at 772. Looking to the totality of circumstances at the time of Nelson's arrest, although Nelson had his hands in the air, Defendant Officers thought that he was armed and had been fleeing from a traffic stop and from Officer McKenna who had been chasing him. Based on their belief that Nelson was armed and a flight risk, viewing all evidence in a light most favorable to Nelson, Defendant Officers' conduct was objectively reasonable when they tackled him to the ground, pulled his arms behind him, put a knee in his back, handcuffed him, and then pulled him into a standing position. *See Johnson v. Scott,* 576 F.3d 658, 660 (7th Cir. 2009) (courts consider severity of crime and whether suspect a flight risk in determining if officers' conduct objectively reasonable); *see also Graham,* 490 U.S. at 396 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a

13

judge's chambers,'" violates the Fourth Amendment.") (citation omitted).  Indeed, under similar circumstances where police officers thought they were confronting an armed suspect who threatened to flee, the Seventh Circuit concluded that it was objectively reasonable as a matter of law when the officers tackled the suspect and forcibly placed a knee on the suspect's back while handcuffing him.  *See Catlin v. City of Wheaton,* 575 F.3d 361, 366-67 (7th Cir. 2009). Meanwhile, although "an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury," *see Stainback,* 569 F.3d at 772, there is no evidence in the record that Defendant Officers inflicted any pain or injury when handcuffing Nelson.  Instead, the evidence, taken in a light most favorable to Nelson, establishes that the handcuffs were too tight and possibly uncomfortable, which does not support a finding that the police officers used objectively unreasonable use of force under the circumstances.  *See Tibbs v. City of Chicago,* 469 F.3d 661, 666 (7th Cir. 2006).  Therefore, the record establishes that Defendant Officers' actions were reasonable under the totality of the circumstances surrounding Nelson's arrest.

Because Nelson has failed to establish a genuine issue of material fact for trial that Defendant Officers used excessive force in effectuating his arrest, Nelson's failure to intervene claim against Officer McKenna also fails.  *See Harper,* 400 F.3d at 1064; *Fillmore v. Page,* 358 F.3d 496, 505-06 (7th Cir. 2004) ("Simply put, there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention.").  The Court thus grants Defendants' summary judgment motion as to Count I of the Complaint.

## III.     Conspiracy Claim – Count III

In Count III of his Complaint, Nelson alleges that all six Defendant Police Officers

14

conspired to deprive him of his Fourth Amendment rights as it pertains to his false arrest claim under 42 U.S.C. § 1983. To establish a civil conspiracy claim under Section 1983, Nelson must show that Defendant Officers agreed to deprive him of his constitutional rights. *See Reynolds v. Jamison,* 488 F.3d 756, 764 (7th Cir. 2007). Because Nelson failed to establish that Defendant Officers violated his constitutional rights in the first instance, he cannot establish his conspiracy claim. *See Smith v. Gomez,* 550 F.3d 613, 617 (7th Cir. 2008) ("conspiracy is not an independent basis of liability in § 1983 actions); *Cefalu v. Village of Elk Grove,* 211 F.3d 416, 423 (7th Cir. 2000) ("there is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution.") (citation omitted)). Therefore, the Court grants Defendant Officers' summary judgment motion as to Nelson's Section 1983 conspiracy claim as alleged in Count III of the Complaint.

## IV.      Illinois State Law Claims – Counts V, VI, and VII

In Count VI of his Complaint, Nelson alleges a false imprisonment claim and in Count VII he brings a malicious prosecution claim against all Defendant Officers. Because "[l]ack of probable cause is a common element of the Illinois claims of false arrest, false imprisonment, and malicious prosecution," *see Stokes,* 599 F.3d at 626, Nelson's malicious prosecution and false imprisonment claims fail. *See Johnson v. Saville,* 575 F.3d 656, 659 (7th Cir. 2009).

Meanwhile, except for a passing reference in a footnote, Nelson fails to present any evidence or legal arguments in support of his state law battery claim as alleged in Count V of the Complaint. *See Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) (cursory arguments made in footnotes are waived). As such, Nelson has waived his state law battery claim. *See Gayton v. McCoy,* 593 F.3d 610, 625 (7th Cir. 2010) (plaintiff's failure to develop

15

argument relating to state law claims constitutes waiver). Moreover, because Officers

Cartwright and Merkel had legal justification to arrest and handcuff Nelson, his state law battery

claim fails in any event. *See* 720 ILCS 5/7-5; *see also McBride v. Grice,* 576 F.3d 703, 707 (7th

Cir. 2009) (under Illinois law, existence of legal justification is affirmative defense to battery).

The Court therefore grants Defendant Officers' summary judgment motion as to Counts V, VI,

and VII of the Complaint.

## CONCLUSION

For the foregoing reasons, the Court grants Defendant Officers' Motion for Summary

Judgment in its entirety.

Dated: May 14, 2010

**ENTERED**

_____

**AMY J. ST. EVE**
**United States District Court Judge**

16